20-4108 Billy Ison et al. v. Madison Local School Board for oral argument not to exceed 15 minutes per side. Ms. Kinsley for the plaintiff's appellate. All right, you may proceed. May it please the court, my name is Jennifer Kinsley and I represent the appellants in this case. I would like to reserve four minutes for rebuttal. The district court erred in upholding the Madison School Board public participation rules against facial and as-applied First Amendment challenges in this case. In its analysis, the district court committed three key analytical missteps. First, the district court improperly conflated the viewpoint neutrality and reasonableness requirements for speech restrictions in limited public forums, collapsing these separate inquiries into just one focused exclusively on legislative justification while ignoring the viewpoint bias inherent in the rules themselves. Second, the district court improperly held that a viewpoint interest in running orderly meetings can save a viewpoint bias regulation when Reed v. Town of Gilbert says exactly the opposite. And third, the district court erred in relying in this court's outdated decision in Lowry when Reed, Model, Iancu, and most recently this court's decision in AFDI make clear that Lowry is no longer controlling law. Can I ask you just really a factual question? There was no dispute between the parties about the facts of this event, right? That's correct. I got the impression when preparing that Mr. Eisen had behaved in some way that was disorderly or aggressive. When I watched the video, that is absolutely not the case. Whatever he was saying, he appeared to say in an orderly manner. So it really, there was objection to what he was saying. It was objection to the content, not the conduct, the way I look at it. So what's your response to that? This is a question later. Did I misunderstand your position or what? But I was surprised when I watched the video. We share your impression that this case all comes down to content and viewpoint, both in terms of the as-applied challenge and the facial challenge. And that's the problem, viewpoint-based application. And that's exactly what happened to Mr. Eisen in May of 2018. He was escorted out of a meeting because of the viewpoint that he was expressing, not because... It looks like he was nicely escorted out. The police officer was obviously trying to de-escalate the situation rather than have it become contentious. We'll agree with that characterization. I think both sides were behaving in a civil manner. We'll agree with that. Returning to the rules themselves, these rules limit speech based on viewpoints that are being expressed. Rule I.2 limits speech that is deemed by the board president to be antagonistic, abusive, or personally directed. All three terms that target viewpoints. And Rule I.3 limits speech that is deemed by the board not to meet unspecified standards of reasonable decorum. The board president testified that he interprets these terms to vary based on his feelings at the and even based on religious persuasion, based on whether a person is, in his own words, Christian or Muslim. The facts of this case show that these rules have only ever been applied to silence people who are critical of the board and its actions. And they have never been applied to silence someone who is in favor of the board. The law in this case is clear, that when speech is restricted in a limited public forum, these speech restrictions must be both viewpoint neutral and reasonable. But in this case, the district court skipped over the viewpoint neutrality step. With respect to viewpoint neutrality, the Supreme Court has issued a number of recent decisions that highlight when a speech restriction runs afoul of this requirement. First, model. A case that this court held in AFDI controls viewpoint analysis cases. In model, the court observed that when in doubt, courts are to interpret viewpoint discrimination broadly. And this is something that the district court did wrong. The district court admitted that it had doubts, particularly about the term antagonistic, which has a dictionary definition of meaning in opposition to, literally meaning having an oppositional viewpoint. But instead of erring on the side of striking down this term, as model says courts are to do, the district court instead upheld it. Next, model teaches us that giving offense, being offensive is a viewpoint. And this is important here because the word abusive in the Madison School Board rules also has a dictionary definition that literally means extremely offensive. So in determining offensiveness, would that be limited to content? Or if a speaker showed disdain for the board by speaking loudly, interrupting, that kind of thing, could that come within the ambit of offensiveness? Or do we look solely at the words? That's a great question, Your Honor. What the court tells us to do, what the Supreme Court tells us to do is to look at the meaning of the terminology as it is applied to speech. And in this case, what the board has done is it's adopted a speech code, not a conduct code. If the board wanted to address conduct, it knows how to do that. In fact, in other places in its conduct, for example, it limits speakers to three minutes of speech. It knows how to adopt restrictions on behavior. It could have given another example. It could have said no yelling or no speaking over top of someone else or no interrupting someone else. These are examples of rules that other jurisdictions have passed that have withheld scrutiny in other cases. But those are not the rules that the board passed. The board utilized terminology that on its face applies to speech, not a manner of speaking. And this is where another Supreme Court case, a recent one called Iancu, comes into play. In Iancu, the Supreme Court rejected the government's invitation to interpret terminology in a speech code to restrict just a mode of communication, a manner of communication, and instead said, when the government restricts speech, we interpret viewpoint discrimination broadly. We interpret these terms as restricting speech, which they do. So Iancu, I think, is also relevant to this inquiry. Returning again to model, which as this court has said in AFDI, is controlling in these cases. Model also says that ideas cannot be suppressed because they are offensive to some listeners. This is another place where the district court went wrong and where I expect the board will go wrong in its own argument in just a few minutes. The board and the district court want this court to interpret these rules to limit speakers because someone in the audience might become upset and act out. This is exactly what model says we are not to do under the First Amendment. We are not to assume that an idea might make someone upset and therefore silence it on that basis. Iancu also helps because it tells us in viewpoint cases to literally look in the dictionary, which is what we have done. We've looked up the word antagonistic. It means being in opposition to. We have looked up the word abusive. It means being extremely offensive. This is the starting point of the analysis. This is exactly what the Supreme Court has done. This is the analysis that we are to follow, and this is where the district court went wrong. So that offensiveness would be an objective standard, not necessarily the subjective comfort of the hearers on the board. Is that right? That's right. Yes. I mean, the First Amendment takes offense, if I may adopt the pun. The First Amendment takes offense at the idea that our speech rights rise and fall based on the subjective reaction of who hears our speech. Yes. Yes. Thank you. And lastly, I just want to speak very briefly to Lowry. Lowry was decided at a time when a content-neutral justification could save a content-based law. That was Word v. Rock Against Racism, an old case. Reed v. Town of Gilbert changed all that. A content-neutral justification, a well-meaning motive on the part of government, can no longer save a law that on its face is content or viewpoint-based. Lowry is no longer controlling in these cases, and this court said as much in AFDI when it said that model is the model that we look at in viewpoint discrimination cases. That is the case that controls this case. The district court did not look at model, and for that reason, it did not. Okay. Good morning, Your Honors. May it please the court, I'm Matt Blickenster on behalf of the Madison Local School District Board of Education. Judge Gibbons, I'll start with the question that you posed to opposing counsel that you indicated is probably better directed at our side, and that is the Billy Eisen incident, which is one of the only two incidents that the I think I fundamentally agree with sort of your characterization of the incident. I think the single most salutary important fact about that incident is that Mr. Eisen said what he wanted to say, and by all appearances and accounts on the record, he finished his statement. You know, the speakers were limited to three minutes. He was pretty close to that. It seems to me that, and the testimony was to this effect, that he did finish his statement. So his speech, despite the fact he was escorted out. What was the motivation for escorting him out at that point? Well, I mean, there was, I mean, he might have been saying something critical of board policy, but that goes along with the territory of being a member of the board in this country. Absolutely, Your Honor. I think you may have had this impression when you looked at the video. I certainly did. I could not understand everything that was being said. I couldn't either. In that video. But at most, it must have been something critical of the members of the board because it wasn't unduly loud. He was doing nothing by his conduct that was disruptive. I couldn't see why it was anything other than a routine presentation by a citizen within the allotted three minutes, other than that he was removed by the officer. The board president testified, Your Honor, that there were some nonverbal things going on that he thought were, you know, directed at not only board members, but members of the audience. Be that as it may. I can't really, I mean, we don't have a transcript. We have a video. So I couldn't, I could not tell everything that was being said. I could only observe the manner in which it was said. Same for me, Judge Givens. But again, I come back to the fact that Mr. Eisen, by all appearances, said his piece and finished his statement. And as you pointed out, was handled very gently. Your, the upshot from your taking that position, he had the floor. He did. He got to use it. He did. He got to say in, so the upshot being there was no constitutional violation. Is that your point? I mean, you have to take that to, and so what, I want to say. Correct. That's, that's my point, Judge Cook, is that he was able to say what he wanted to say at that meeting. And he was able to say what he wanted to say, which was often very critical of the board, as reflected in the minutes and the record. That is not against the law. No, no. But the, but the. And the board was acting in an area that is highly controversial. It is. I mean, how to, guns in schools and how to control. Yes, I agree with. Gun violence. I agree with everything both of your honors are saying, but my point is his speech was not suppressed. That yes, it's. All right. It was. Well, that might, excuse me, go ahead. That might go to damages. Right. It doesn't really go to anything else. I mean, if we look at this, the text of these rules, it appears that, I mean, antagonistic. Well, disagreeing with somebody about a highly controversial issue is taking a position that is antagonistic. I mean, abusive. I mean, that's criticizing the board. I can't, I don't, I mean, I don't know. It's some of the, some of the language lends itself to interpreting the rules as if you become critical of me as a member of the board, you're gone. And in fact, what happened sort of supports that. Respectfully, Judge Gibbons, I disagree with, with that conclusion from this record. This record shows that these plaintiffs spoke out against this policy over 70 times over the course of 20-some board meetings, and that they were highly critical of the board and this policy, and that in all those times, we have two incidents here. One is the Mr. Eisen incident that we're talking about, and the other is the incident where two of the, excuse me, three of the plaintiffs were not allowed to speak because they didn't submit their own registration forms in advance. So this one, let's just stick with Billy. This incident, your point, you're, you contend he had his say. It, but it's violative if the, the policy, you're agreeing that the, well, I don't know that you're agreeing the policy might be in it, standing alone. Now I'm asking as applied. There's an as applied challenge here also, so shall we engage that? Yeah, I think the, the as applied challenge, Judge Cook, is I think is the Billy Eisen incident and the, and the two, and the incident where three of the plaintiffs weren't allowed to speak at one particular board meeting. Okay, but he has no curtailment of his First Amendment rights because he got to have his say. That, that would be my primary point. Ejected. Your point is three minutes is all he got anyway? My point is he, yes, that's right. He, he had used up most or all of his allotted time. He said what was, what he wanted to say, which was very critical, which we, which he had a right to say. He has been allowed many other times to say things along those very same lines without any incident. What's the point of making that argument right now? Well, because the point is that it goes to, I think it bears on, there was something in the mind of the board president that was different about this one, and I think it goes to the, the non-verbals that he testified to. How about that? I'm sick of you out. Yeah, I, I, I don't, I don't think that's. You could see how they would be sick of them. Well, yeah, but I. It doesn't, that's not important to this court. So I want to, I want to ask you, since you say that he had had an opportunity basically to use his three minutes to say what he had said and, you know, he didn't persist in trying to speak then, what was the purpose of then removing him from the building? And if, and by removing him after he had concluded his roughly three minutes, didn't that have a potentially a chilling effect on other people who might speak and speak in a similar vein? I don't think so, Judge Donald, because. Why not? Because people continue to speak about this issue and take the same position that he did, and he continued to take the same position in subsequent board meetings. And, you know, I mean, I think we can all assess from, you know, seeing him that he was one who was not likely to be chilled. And in fact, he wasn't. He continued to speak out against this. What was the purpose then of removing him if he had already concluded? What was the board's purpose in taking that action at that time under those circumstances? I think the purpose was, and reasonable people may disagree about whether this was a valid purpose or not, but I don't think it amounts to a First Amendment issue. But I think the purpose of the board was the meeting was starting to get heading for off the and I think the board president gave several warnings to Mr. Eisen to ask him, first of all, to address the board rather than the audience. And also some of the warnings were inaudible, frankly. OK, so then it does seem like it's done to set an example and send the signal that, you know, potentially if certain things occur, you can be ousted and that could potentially have a chilling effect. Yeah, this is not an isolated episode in the whole chronology, Judge Donald. I mean, we've got a long history of his position being expressed by him and others to the board under this policy. And so, you know, sort of my point on all of this is that the proof of the pudding is in the tasting and the tasting here is many people spoke out against this policy and in many instances said without interruption or any incident, things that were very negative about board members. I'm just not persuaded about the antagonistic nature of this pudding that you're talking about. Let me address that, which is sort of goes to the facial challenge issue, Judge Donald. So before the recent Supreme Court cases, Maytala and Iancu, I mean, it was pretty settled law, certainly in this circuit under the Lowry case, that a public body could adopt some certain speech restrictions, as long as they're not viewpoint based, that are designed to prevent disruption or interference or disorder at a meeting. The plaintiff's position on the facial challenge is that these Supreme Court cases have upset that apple cart altogether. I don't think that is correct for some very basic, simple reasons. One, the Supreme Court hasn't said that. They don't mention any of this law in these cases. There's nothing in those cases that suggests that public meetings now have to be free-for-alls where anything goes. And that just doesn't correspond with decades of precedent about designated public forums. So there has to be some type of restriction that a public body can have that's aimed at preventing disruption or interference or disorder. So how does a public body phrase those types of restrictions, if not for the types of things that courts, including this court in Lowry, have found to be constitutional in the past? I guess what the public entity does is probably consult with its lawyer, who hopefully is skilled and knowledgeable about First Amendment issues, and manages to help the public body craft a rule that is truly aimed at conduct that is disruptive of the meeting, but without defining disruptive in any way as based on the content of the expression. But under the plaintiff's theory of the case, Judge Gibbons, I have a hard time understanding what that policy would look like, because if you just said disruption, the plaintiffs would say, well, that can't be it, because that's like a heckler's veto. You're right, but this area of the law is peppered with difficulty in determining what's permitted and what isn't. Absolutely agreed. I completely, 100 percent agree with that statement, Judge Gibbons. You know, you stand up today and defend by saying he had his say, Mr. Eisen had his say. That is not what your brief advocates. You say it's content neutral. You defend everything, and you say Lowry is still Goodyear law and counseled. We believe it is, Judge Cook. Okay. Yeah, yeah. We defend the Eisen incident. Let me separate facial challenge from the as-applied challenge. Yes. And so the facial challenge, obviously, is just policy itself. Is there somewhere in your brief that he had his say? Yeah, yeah, yeah, that he finished his statement. I'm looking, pardon? Yeah, we say in our brief that he finished his statement, yeah. But that isn't the defense, and because he finished his statement, you should affirm. I mean, right? No. I don't know. It just didn't, I was surprised it wasn't there, because it was kind of your first point here. Well, yeah, we may not have hammered the point home, but we certainly made the point that he finished his statement. And, you know, That was just fact. Well, what the board president said was that he was being unruly, he uses a quote, not following the rules, being hostile in his demeanor, attacking individuals. He said that he let him speak until other people were starting to object and getting offended by it, at which point he stopped Billy to get the unruliness down. And it seems we're all in agreement that there was no unruliness. We don't know whether people were getting offended or not, but that's not, that's, I don't believe that's the basis for removing somebody that members of the audience might have disagreed with him, that he was hostile, unruly. I mean, it sounds like we all agree that none of that happened. I don't know exactly where that fits into the analysis, but. Yeah, the meeting was not completely out of control, Judge Gibbons. I think, you know, as you saw from the end of the video, there was a lot going on there. I seem to hear, I think there were probably some competing voices from the audience, but people weren't yelling. They weren't taking any physical steps toward each other. Mr. Eisen was speaking in a calm voice. I don't disagree with that characterization. What I would say on that particular point is that courts have always held that the standard for removals for somebody from a meeting is exceedingly low. And, you know, the plaintiffs in their entirety have been allowed to express these opinions over and over again under this policy. I think all this goes to, I think all this goes, though, to whether at the end of the day, there might be damages. I mean, when you look, it's a challenge to the rule about speaking in court in, not court, excuse me, in a board meeting and whether it's, you know, whether it's content neutral or not, you know, so on and so forth. It's really not about, well, he got to protest a lot. We would argue that the policy is content neutral and that these cases have not completely undone decades of precedent on these types of issues, Your Honor. I think, I have no idea how long your time has been up, which I don't know, that might be, it might be good that you got my eye off the timer. I think you're done. Judge Cook asked, looked like. Nope, I'm completely finished here. Thank you. You don't have any, you have anything further to stop? Okay. I have four points in response. Number one, as to the Billy Eisen incident, the First Amendment requires that we employ the least restrictive means. The least restrictive means in dealing with that incident, to the extent there were some minor disruptions, would be to ask the people who were creating the disruptions to stop. That would mean asking the audience to be quiet, not asking Mr. Eisen to sit down or stop his comments. Should we talk about damages for a minute? Yes, Your Honor. What, if the, how was he harmed? Constitutional damages are admittedly difficult, and I believe we've pled nominal damages in this case, and that's what we would be seeking on remand. Okay. Next, I. Something to appear at victory here, I mean, right? A moral victory. Yes, a moral victory. And that's because constitutional damages are so difficult to evaluate. And so we have, you know. Particularly where the gentleman had his say. Yes, we do admit that he concluded his remarks, although there is damage to the stigma of being escorted out of the room. There is stigma to a chilling effect. There is an impact of a chilling effect, which is why courts have created these doctrines. The adversary says, of course, there was no chilling effect by the action, but you say not so. It inevitably has that potential effect. It inevitably has a potential effect. It's hard to measure and quantify, but it does exist. It's very real, and courts measure that, courts acknowledge its existence, although it's hard to measure. Let me turn next to the, this idea of the 70 other times or some such number that they have spoken. I hear my opponents saying they want credit in some way in the First Amendment calculus for this. And the First Amendment does give, sometimes, the government credit for amplifying an opportunity for speakers to speak. That only happens in time, place, and manner cases, where an ample opportunity to speak, ample alternative channels of communication are credited in the weighing. This is not a time, place, and manner case. This is a viewpoint neutrality case. The First Amendment does not credit the government for giving speakers an opportunity to speak someplace else when their viewpoint is put at risk here. I also hear my opponents saying they want credit for being even-handed. Model specifically addresses this. The Supreme Court has said it does not matter if a viewpoint discriminatory regulation is meted out even-handedly. The problem is in the facial flaw itself. We do not trust the government to even-handedly apply facially flawed regulations. And lastly, I hear my opponents saying that the Supreme Court did not acknowledge that it was changing the law in some way when it was addressing trademark regulation. That's just simply not true. In Model, the Supreme Court said that the Lanham Act and trademark regulation was analogous to limited public forum regulation because viewpoint neutrality is a requirement for both. That is a direct quote from Model. The Supreme Court specifically acknowledged that these cases are the same, which is why this Court in AFDI acknowledged that Model is the framework, not Lowry, not Ward, Model. That is the case that the District Court should have looked at and did not. For that reason, the District Court should be reversed. Thank you. We appreciate the argument that both of you have given. We'll consider the matter carefully. That's the last case for the morning. I want to compliment the staff from the clerk's office on the great job of getting us through a difficult morning with a lot of hoops to go through that we normally don't have. Thank you very much.